**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**RUTH E. GOMEZ,**

                **Plaintiff,**

**-vs-**                                        **Case No. 6:06-CV-1593-ORL-KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

                **Defendant.**

**_____**

**ORDER**

      This cause came on for consideration without oral argument on the Complaint

filed by Ruth E. Gomez, seeking review of the final decision of the Commissioner of

Social Security denying her claim for social security benefits.  Doc. No. 1.  The

Commissioner answered the Complaint and filed a certified copy of the record before the

Social Security Administration (SSA).  Doc. No. 9.  Pursuant to the consent of the

parties, this matter has been referred to me for disposition under 28 U.S.C. § 636(c).

Doc. Nos. 18, 20.

**I.**      **PROCEDURAL  HISTORY.**

      In August 2001, Gomez applied for disability benefits under the Federal Old Age,

Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq*.

(sometimes referred to herein as the Act).  R. 54-56.  She alleged that she became

disabled on July 1, 2000.  R. 57. Gomez's application was denied initially and on

reconsideration. R.  41-43, 46-48.

Gomez requested a hearing before an administrative law judge (ALJ).  R. 49.  An ALJ held a hearing on September 4, 2003.  Gomez, who was represented by counsel, testified at the hearing through a Spanish interpreter.  Juliana Hey, a vocational expert (VE), also testified.  R. 367-400.

After considering the testimony and the medical evidence presented, the ALJ determined that Gomez was not disabled, using the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2 as a framework and relying upon the testimony of the VE regarding available jobs that Gomez could perform. R. 25-34. Gomez subsequently sought review of this decision in this Court.

The Honorable James G. Glazebrook, United States Magistrate Judge, presiding pursuant to 28 U.S.C. § 636(c), found that the ALJ did not explain what weight she placed on the opinions of two of Gomez's treating physicians.  R. 452-53.  Accordingly, he remanded the case pursuant to sentence four of § 405(g) "to allow the Commissioner to explain the basis for her decision, and to hold such further proceedings as she may be advised."  R. 453.

On remand, the ALJ held another hearing.  Gomez appeared at the hearing, represented by counsel.  The ALJ admitted additional documentary evidence.  No additional testimony was presented.  R. 561-66.

After consideration of the testimony and review of the medical records, the ALJ found that Gomez was insured under OASDI through December 31, 2002.  The ALJ

found that Gomez had not performed substantial gainful activity since the alleged onset day of her disability. R. 410.

The ALJ concluded that the medical evidence showed that Gomez had fibromyalgia/chronic fatigue, obesity, osteoarthritis, and complaints of back and neck pain, which were severe impairments.  These impairments did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).[1]  R. 410, 413.

The ALJ gave little weight to the opinion of Dr. Jackson, a treating physician, who opined that depression significantly interfered with Gomez's daily functioning. Instead, she relied upon the opinion of Dr. Borkosky, a consultative psychologist, who found that Gomez had a good ability to understand, remember and carry out instructions and a fair ability to respond appropriately to supervision, coworkers and work pressures.  She also concurred with the assessments of physicians who reviewed Gomez's records who found that Gomez's mental condition resulted in only mild limitations in activities of daily living, social functioning, and concentration, persistence or pace.  R. 412.  The ALJ specifically observed that "it is clear that when the claimant seeks treatment and is compliant with prescribed medications, her mental condition improves significantly and results in minimal mental functional limitations."  R. 412-13.  Accordingly, the ALJ

---

[1] The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

concluded that Gomez's mental disorders were not severe impairments.  R. 410.

The ALJ concluded that Gomez had the residual functional capacity (RFC) to do the following:

> [F]requently lift/carry up to 10 pounds, occasionally, lift/carry up to 20 pounds, sit for about six hours of a 8-hour workday, and limited to walking/standing of no more than two hours total per day because of the effects of her obesity on her musculoskeletal system along with pain from osteoarthritis and fibromyalgia; occasionally stoop, crouch, crawl, and climb ladders, ropes and scaffolding.  She would be able to frequently reach in all directions (including overhead), handle, and finger, but was to avoid concentrated exposure to extreme cold and working at heights or around machinery.

R. 413.  In reaching this conclusion, the ALJ found that Gomez's testimony about the limitations arising from her impairments was not credible to the extent alleged.  R. 414.  She noted that Gomez was able to go grocery shopping and regularly attend church despite her subjective complaints.  R. 414.

The ALJ gave little weight to Dr. Jackson's opinion that Gomez was unable to work, as it was not supported by objective evidence and was inconsistent with the opinion of other doctors who treated Gomez.  R. 415.  The ALJ gave less weight to the opinion of Dr. Thomas-Richards, a consultative physician, who opined that Gomez would be more restricted in her functional capacity.  R. 414.  While Dr. Thomas-Richards opined that Gomez would need to have the option to change positions as needed, the ALJ found no medical support for this limitation.  R. 415.  She also gave lesser weight to the opinion of Dr. Tsai, who did not begin treating Gomez until after the date on which her OASDI insurance coverage expired.  R. 415.  She considered the treatment records from Dr. Ibrahim, but noted that he did not provide a specific functional assessment.  R.

415.

The ALJ found that Gomez's past relevant work required the ability to perform in excess of her RFC.  R. 416.

Using the Grids as a framework, and relying on the VE's testimony, The ALJ determined that there were jobs available in the national economy that Gomez could perform.  R. 416-17.  Therefore, the ALJ concluded that Gomez was not disabled.  R. 417.

Gomez timely sought review of this decision by this Court.  Doc. No. 1.

## II.   JURISDICTION.

Plaintiff having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

## III.   STATEMENT OF FACTS.

The facts of record are adequately stated in the ALJ's decision, and in the parties' memoranda.  Accordingly, I will only summarize the pertinent facts to protect Gomez's privacy to the extent possible.

I adopt by reference Judge Glazebrook's review of the evidence of record regarding Gomez's physical impairments at the time he considered the case.  R. 445-51.

Regarding her mental impairments, Gomez was referred for psychiatric evaluation in January 2001.  R. 139.  At that time, Gomez "reported that she was experiencing depression, sadness and crying throughout the day; . . . poor sleep and increased appetite; . . . feelings of worthlessness, hopelessness and helplessness; and low energy and poor drive" that interfered with her everyday functioning.  R. 139.  The assessment after evaluation was major depressive disorder, recurrent, severe, generalized anxiety

disorder and personality disorder not otherwise specified.  The professional making the assessment rated Gomez's global assessment of functioning (GAF) at 50.  R. 140. Subsequent records from this treatment provider reflect that Gomez's condition improved with medication.  R. 132-36.

Bruce G. Borkosky, Psy.D., examined Gomez on October 2, 2001, at the request of the SSA.  At that time, Gomez was not taking her medication.  R. 128.  Nevertheless, Dr. Borkosky found that Gomez had a good ability to understand, remember and carry out instructions and a fair ability to respond appropriately to supervision, coworkers, and work pressures.  R.  129.

Gomez was evaluated at the Seminole County Mental Health Center, Inc. in August 2002.  During her first visit, she reported that she was out of medication.  R. 283-84.  The evaluating professional's assessment was that Gomez suffered from a mood disorder, personality disorder and generalized anxiety, with a GAF of 35.  R. 288. Thereafter, she was treated by Jenaro Fernandez, M.D.  As of September 2002, Dr. Fernandez found that Gomez's GAF score was 58 with the use of medication.  R. 333-35.  As of May 2003, Dr. Fernandez noted that Gomez was "really euthymic," with good motivation and fair insight.  She was not suffering side effects from her medication.  R. 338.   In July 2003, Gomez reported some episodes of panic, but Dr. Fernandez did not believe that these occurred due to a panic disorder. Otherwise, she was "asymptomatic psychiatrically." R. 360.

On remand, Gomez presented additional records of her treatment by Dr. Ibrahim from November 2003 through February 2006.  R. 481-89.  On November 14, 2003, Gomez complained of some numbness on the right side of her face and a tingling

sensation in her right arm and leg.  Upon examination, Dr. Ibrahim found her muscle strength to be 4/5, and her sensation and reflexes to be normal.  R. 489.

In November 2004, Gomez told Dr. Ibrahim that she had been in a motor vehicle accident on February 7, 2004.  Thereafter, she had persistent lumbar pain that radiated to her lower extremities, with headaches, dizziness and lightheadedness.  R. 486. Upon examination, Dr. Ibrahim found minimal tenderness in the area of the area of her spine and moderate tenderness in her arms, legs and knees, with some limitation in lumbar range of motion. R. 487.

On March 9, 2005, Gomez told Dr. Ibrahim that she continued to have pain in the lumbar region and in her neck which caused her "difficulty doing her daily chores at home."  R. 483.  Dr. Ibrahim observed moderate tenderness in the area of her cervical spine with some limitation in motion and tenderness in other areas of her spine.  Her gait was somewhat antalgic, but her sensory and motor systems were normal.  R. 484.[2]

In February 2006, Gomez complained of moderate pain in her neck and lower back, stiffness and swelling in her joints, and other subjective symptoms.  R. 481.  Dr. Ibrahim gave Gomez exercises to do at home and recommended a course of physical therapy.  R. 482.

Gopal K. Basisht, M.D., a rheumotologist, wrote on March 22, 2006, that he had treated Gomez for five months.  She complained of whole body pain, her right wrist was swollen, and she had difficulty moving and walking.  She had stopped taking her medication.  Dr. Basisht's diagnosis was fibromyalgia.  He instructed Gomez to restart

_____

[2] Later in March 2005, Gomez sought emergency room treatment for jaw pain and shortness of breath.  R. 494-505.

her medications.  R. 506.

Finally, Gomez presented records of her treatment by Magdalena Beltre, M.D., from March through June 2006.  R. 510-37.  An MRI of the thoracic spine taken on January 10, 2005, showed no disc protrusions or stenosis.  R. 534.  She had some mild disc degeneration, desiccation and disc space narrowing in her lumbo-sacral spine and a disc bulge without stenosis.  R. 532.

In May 2006, Augustine V. Joseph, M.D., a neurologist, examined Gomez at the request of Dr. Beltre due to complaints of seizures each morning.  R. 508-09.  Upon examination, Dr. Joseph observed that Gomez had tenderness in her cervical paraspinal muscles without spasms with mild restriction of neck movements.  Her muscle strength, reflexes, sensory system and gait were normal.  R. 508.  Dr. Joseph's assessment was a generalized seizure disorder, for which he prescribed medication.  R. 508-09.

## IV.     STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090

(5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 404.1520(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform."  *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

## V.    ANALYSIS.

Gomez contends that the ALJ erred by failing to give controlling weight to the opinions of Drs. Thomas-Richards, Ibrahim and Jackson, and by finding her complaints of pain and fatigue to be not fully credible.  She also asserts that the ALJ erred by finding that her mental impairment was not severe at step two of the evaluation process.  These are the only issues I will address.[3]

*A.    Treating Physicians.*

The law of this circuit is clear that the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary. . . . . The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error. . . . We have found "good cause" to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. . . . We have also found good cause where the doctors' opinions were conclusory or inconsistent with their own medical records.

*Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)(internal citations omitted). Gomez contends that the ALJ failed to establish good cause for giving less than controlling weight to the opinions of Dr. Jackson, Dr. Thomas-Richards and Dr. Ibrahim.

### 1.    Dr. Jackson.

The ALJ gave little weight to Dr. Jackson's opinion because it was not consistent with the evidence of record.  Substantial evidence supports this conclusion.

---

[3]  I advised counsel in the scheduling order that issues not specifically raised would be considered to have been waived.  Doc. No. 10 at 2.

Dr. Jackson provided many inconsistent opinions regarding Gomez's ability to work and the reasons supporting those opinions.  In September 1989, he completed a questionnaire in which he indicated that Gomez had chronic fatigue syndrome and depression that rendered her physically and mentally unable to do any work then or in the future arising from unspecified permanent restrictions in walking, standing, sitting, reaching, climbing and lifting.  R. 263-64.  In the same questionnaire, however, Dr. Jackson opined that Gomez could attend school 25 hours per week.  R. 264.  On October 19, 1998, Dr. Jackson opined that Gomez had post-concussion syndrome and low back pain expected to last about 6 weeks that rendered her unable to work due to temporary restrictions on walking, standing, sitting, reaching and climbing.  R. 278-79.  Yet, in December 1998, he opined that Gomez was totally (100%) disabled due to chronic fatigue, chronic low back pain and migraines.  R. 259.

In May 1999, Dr. Jackson prepared two questionnaires.  In the questionnaire dated May 7, 1999, he opined that Gomez had fibromyalgia, back pain and migraines expected to last indefinitely that precluded her from working or attending school.  R. 272-73.  However, on May 27, 1999, Dr. Jackson opined that Gomez could work 25 hours per week.  He indicated that she would have unspecified permanent restrictions on walking, standing, climbing, and lifting more than 10 pounds, but no restrictions on sitting and reaching.  He recommended exercise as a course of treatment.  R. 270-71.

In January 1999, Dr. Jackson cited a motor vehicle accident (MVA) and back pain as injuries expected to last 6 to 8 months that rendered Gomez unable to work due to temporary restrictions on walking, standing, sitting, reaching and climbing.  R. 276-77.  On July 19, 1999, Dr. Jackson opined that Gomez had back pain resulting from

sprain/strain, depression and fibromyalgia that precluded her from working but would permit her to attend school less than 10 hours per week.  In this questionnaire, Dr. Jackson opined that Gomez's limitations on walking, sitting and reaching were only temporary restrictions, and that she could lift 10 to 15 pounds.  He recommended a course of physical therapy.  R. 267-68.

In September 1999 through June 2000, Dr. Jackson again opined that Gomez's physical and mental impairments precluded her from working or going to school then or anytime in the future due to fibromyalgia, back pain and migraine headaches resulting in unspecified permanent restrictions on walking, standing, sitting, vision-hearing, reaching, climbing and lifting.  R. 250, 260-61.  Dr. Jackson's medical records for this period reflect that in February and March, 2000, Gomez complained of pain in her lower back sometimes radiating to her thighs and relieved somewhat with muscle relaxants.  R. 255, 257. In April 2000, she complained of headaches and dizziness.  R. 253.  In June 2000, she complained only of non-radiating neck pain and difficulty sleeping.  R. 245.

An ALJ is entitled to disregard a treating physician's opinion that a claimant is disabled, *see* 20 C.F.R. § 404.1527(e)(1), particularly when, as here, the record reflects that even the treating physician did not consistently opine that the claimant was disabled. Furthermore, as the ALJ found, Dr. Jackson's records of treatment reflect that Gomez did not consistently complain of pain and headaches during the time that Dr. Jackson opined that she was totally disabled as a result of these subjective symptoms. Accordingly, the ALJ fulfilled her obligation to state good cause for giving little weight to Dr. Jackson's opinion as to the functional limitations arising from Gomez's physical and mental condition.

## 2.    Dr. Thomas-Richards.

Gomez contends that the ALJ erred by rejecting Dr. Thomas-Richards' opinion that she would need a sit/stand option to be able to work.  The ALJ found no medical basis to support this restriction.

Dr. Thomas-Richards examined Gomez only once, on October 24, 2001, at the request of the SSA.  Upon examination, Dr. Thomas-Richards observed that Gomez had full range of motion from the hips to the ankles with reflexes intact and no appreciative motor weakness.  She complained of low back pain during a straight-leg raising test.  R. 144-45.  Dr. Thomas-Richards noted that Gomez's response to testing "was rather dramatic relative to her low back symptomatology."  R. 145.  She had some restriction of motion in her lower back, and Dr. Thomas-Richards detected mild to moderate paravertebral muscle spasm.  R. 145.

Dr. Thomas-Richards gave specific reasons for most of the restrictions in his RFC determination.  For example, he cited carpal tunnel syndrome as the basis for restricting Gomez's work at heights and around hazards, and low back symptomatology for the lifting, pushing and pulling, and repetitive foot movement restrictions.  He also cited chronic low back pain as a basis for limiting postural activities.  It is noteworthy that Dr. Thomas-Richards did not cite the medical basis for his conclusion that Gomez would need to change positions frequently.  Indeed, in the summary section of the report, Dr. Thomas-Richards indicated only that the *ideal* job would have a "sit/stand option with supervision." R. 146.

As noted above, Dr. Thomas-Richards did not cite the medical basis for this limitation, in contrast to the medical basis he provided for other parts of his RFC

assessment.  Furthermore, he found that Gomez exaggerated the functional limitations arising from her low back symptomatology.  Substantial evidence supports the ALJ's conclusion that a sit/stand option is not supported by the medical evidence, which is sufficient good cause to reject that functional limitation.

### 2.  Dr. Ibrahim.

Gomez contends that the ALJ erred by failing to note in the decision Dr. Ibrahim's conclusion that she had connective tissue disease.  The ALJ indicated that she had reviewed Dr. Ibrahim's medical notes.  R. 415.  She also noted Dr. Ibrahim's belief that Gomez might have "atypical connective tissue disease."  R. 411.   While Dr. Ibrahim later confirmed that Gomez fulfilled the diagnostic criteria for atypical connective tissue disease, R. 304, Gomez has not established how this fact, if overlooked by the ALJ, would undermine the ALJ's RFC assessment.  *Cf.  Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005)("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection which is 'not enough to enable [the district court or this Court] to conclude that [the ALJ] considered her medical conditional as a whole.' *Foote* [*v. Chater*], 67 F.3d [1553], 1561 [11th Cir. 1995].").

### B.    Credibility.

Gomez asserts that the ALJ erred by finding her complaints of pain and other subjective symptoms not entirely credible based solely on her ability to shop for groceries and attend church.

The ALJ found, "[a]fter considering the evidence of record . . . that the claimant's medically determinable impairments could have been reasonably expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." R. 414.  In making this credibility determination, the ALJ expressly applied the "pain standard" used in this circuit.  R. 413.  Under the "pain standard," if the Commissioner discredits the claimant's subjective testimony, he "must articulate explicit and adequate reasons for doing so."  *Foote*, 67 F.3d at 1561-62.

While the ALJ cited Gomez's activities of daily living in support of the credibility determination, review of the decision as a whole reflects that the ALJ relied on many other facts to support her conclusion.  She noted that Gomez's subjective complaints were "somewhat exaggerated and disproportionate to the diagnostic and clinical findings," R. 414, citing numerous examples to support this finding.  The ALJ's conclusion is consistent with Dr. Thomas-Richards' observation that Gomez's response to examination "was rather dramatic relative to her low back symptomatology."  R. 145.

The ALJ applied the correct legal standard and articulated evidence in the record that supported her conclusion that Gomez's subjective complaints were credible, but not to the extent alleged.  The ALJ did not rely solely on Gomez's ability to shop for groceries or attend church in reaching her credibility determination.  As such, no basis exists to overturn the ALJ's credibility determination.

C.     *Mental Impairment.*

Gomez asserts that the ALJ erred by failing to find her mental impairment to be severe at step two of the evaluation process.  Courts have found that the failure to include an impairment among the severe impairments at step two of the evaluation process is harmless if the ALJ considered the impairment in subsequent steps of the evaluation.  *See, e.g., Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *Street v. Barnhart*, 340 F. Supp. 2d 1289, 1293 (M.D. Ala. 2004).

The ALJ addressed the functional limitations arising from Gomez's mental impairment throughout her decision, even though she did not find Gomez's mental impairment to be severe at step two of the analysis.   In reaching her RFC assessment, the ALJ revisited Gomez's complaints of mental impairments.  She noted that Dr. Borkosky, who examined Gomez in October 2001, found that Gomez had a good ability to understand, remember and carry out instructions, and a fair ability to respond appropriately to supervision, coworkers and work pressures despite failing to take her medication. As of September 2002, Dr. Fernandez found that Gomez had a GAF score of 58, indicative of only moderate limitations in functioning. By May 2003, Dr. Fernandez opined that Gomez had improved substantially, and by July 2003 she was psychiatrically asymptomatic.  The reviewing physicians similarly concluded that Gomez's mental impairments resulted in only mild limitations on activities of daily living, social functioning and concentration, persistence and pace.  R. 157, 222, 412.   This evidence supports the ALJ's conclusion that Gomez's mental condition was "well-controlled with medications when she is compliant with treatment."  R. 414.

Because the ALJ considered Gomez's mental impairments at subsequent steps of the sequential analysis, her failure to find the mental impairment to be severe at step two of the analysis was harmless.

## VI.    CONCLUSION.

For the reasons set forth herein, it is **ORDERED** that the decision of the Commissioner is **AFFIRMED.**  The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** this 11th day of February, 2008.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE